**AMERICAN HARDWARE MUTUAL INSURANCE COMPANY, a corporation, Plaintiff–Appellee,**

v.

**BIM, INC., a West Virginia corporation, Defendant–Appellant,**

**and**

**Timothy N. Rexroad, Defendant.**

**Jimmy Dale POYNER, d/b/a J & D Rental Sales; Rotal Corporation, d/b/a Spanky and Alfalfa's; Betty L. Phillips, d/b/a Little Britches, Inc.; Sharon S. Stowers, d/b/a Modern Hair Design, Appellants,**

**American Hardware Mutual Insurance Company, a corporation, Plaintiff–Appellee,**

v.

**BIM, INC., a West Virginia corporation; Timothy N. Rexroad, Defendants.**

Nos. 88–3189, 88–3208.

United States Court of Appeals, Fourth Circuit.

Argued May 11, 1989.

Decided Sept. 6, 1989.

Rehearing and Rehearing In Banc Denied Oct. 17, 1989.

134

Sterl F. Shinaberry, Charleston, W. Va., (J. Burton Hunter, III, Randall C. Levine, Buckhannon, W. Va., on brief) for defendant-appellant.

James Robert Watson (Steptoe & Johnson, Charleston, W. Va., on brief) for plaintiff-appellee.

Before PHILLIPS and MURNAGHAN, Circuit Judges, and KAUFMAN, Senior District Judge for the District of Maryland, sitting by designation.

PHILLIPS, Circuit Judge:

This is an appeal by B.I.M., Inc. (BIM) from summary judgment entered against it in a declaratory judgment action by American Hardware Mutual Insurance Company (American Hardware) seeking to establish non-coverage with respect to a fire loss under a binder issued by an American Hardware agent. Because we conclude that genuine issues of fact respecting BIM's claims of waiver or estoppel to deny coverage precluded the entry of summary judgment, we reverse and remand for further proceedings.

I

BIM is a West Virginia real estate holding and property management company. In June of 1985, C. Fred Iden, then the company's vice president, contacted John Theibert, an American Hardware field agent, and inquired whether American Hardware might be able to provide "multi-peril" and "all risk" insurance coverage for BIM's recently purchased Tennerton Plaza shopping center. After several discussions with Iden concerning BIM's specific needs, Theibert prepared an application and binder for $325,000 in "all risk" coverage and $500,000 in "multi-peril" protection.

Iden met with Theibert on June 20, 1985 and signed the application. The parties now dispute whether, in the course of their

discussions, Theibert told Iden that interim coverage could not be "bound over" (pending American Hardware's approval of the permanent policy application) unless BIM paid an initial "premium deposit." They agree, however, that Iden on that date tendered a check payable to American Hardware in the amount of $1,266.00, which represented 20% of all contemplated premiums for the first full year of coverage. Theibert in turn issued a receipt for the check, which was drawn on the account of C. Fred Iden Builders, Inc. at the Central National Bank of Buckhannon.

Shortly thereafter, American Hardware sent Iden a copy of the completed and signed application/binder and a separate "Certificate of Insurance." The latter document bore a prominent legend stating that "THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES [LISTED] BELOW." American Hardware also issued a similar certificate to the Cherry River National Bank, which held a purchase money deed of trust on the Buckhannon property.

On several occasions between the end of June and the early part of August, Iden allegedly contacted Theibert to inquire about the status of BIM's application for permanent coverage. Theibert purportedly reassured Iden that American Hardware's underwriting department in Atlanta was processing the application and that the binder remained in effect.

On July 12, 1985, Central National dishonored the premium deposit check and notified Iden that it had returned the item for "insufficient funds." American Hardware's bank subsequently redeposited the check, which Central National again dishonored on July 22, 1985. Shortly thereafter, Central National sent a second NSF notice to Iden and informed American Hardware that, as drawee bank, it would not accept the item for redepositing.

On July 30, 1985, American Hardware's home office first learned that the premium deposit check was worthless. Then, after a number of unexplained delays, underwriter Janet Cabe finally contacted Theibert on August 19th and notified him that the company intended to issue a "Notice of Cancellation" on the BIM policy. Theibert asked that the company delay any further action for a few days, however, while he attempted to contact Iden and obtain payment. Cabe apparently agreed, but Theibert was unable to reach Iden until August 22, at which time Iden informed him that the shopping center had been destroyed by fire the previous evening.

After conducting a brief claims investigation, American Hardware retained outside counsel in an attempt to determine its liability under the binder. At first, attorney James R. Watson advised the company that it was liable for the fire loss, since it had not issued a policy cancellation notice. After further investigation of the facts surrounding Central National's ultimate dishonor of the deposit check and American Hardware's handling of the BIM application, however, Watson concluded that the company was not liable. American Hardware thereupon instituted the present declaratory judgment action to establish its non-liability.

The company's theory was that any prospective coverage under the binder was void *ab initio*, inasmuch as the dishonor of BIM's deposit check amounted to a "failure of consideration." BIM claimed, however, that American Hardware had never indicated that the premium deposit was required to "bind over" interim coverage. In the absence of an agreement to the contrary, BIM argued, a "promise to pay" is sufficient consideration for an insurance binder. Thus, while the tender of an NSF check for payment of the initial premium on a *permanent* policy would void all coverage thereunder, *see Nationwide Mutual Ins. Co. v. Smith*, 153 W.Va. 817, 172 S.E.2d 708, 712 (1970), the dishonor of BIM's check here had no effect on American Hardware's obligations under the *binder*.

BIM also claimed that, even if the premium deposit was a "condition precedent" to

binder coverage, American Hardware waived the condition (or estopped itself from declaring the binder void) when, *inter alia:* (1) Theibert issued a receipt for the deposit check; (2) the company issued "Certificates of Insurance" to BIM and the Cherry River National Bank; (3) Theibert reassured Iden in late July or early August of 1985 that the binder remained in effect while the "home office" continued to process the application for permanent coverage; (4) after receiving notice that it was worthless, American Hardware's home office nevertheless retained the check; (5) the company failed to "act promptly" either on BIM's application for permanent coverage or in response to Central National's NSF notification; (6) the company failed to issue a "Notice of Cancellation"; and (7) shortly after the fire, counsel for American Hardware represented that the binder covered BIM's loss.

Finding that "[t]he material facts necessary to resolve this case ... are undisputed," the district court rejected BIM's claims on both the "failure of consideration" and waiver/estoppel questions.

> Where a check is taken for an insurance premium it will ordinarily be assumed that the acceptance was conditioned upon the check being honored. *Nationwide* [, 172 S.E.2d] at 711. If a check is not honored, then the policy is void *ab initio.* [*Id.* at 712.]
>
> The [deposition] testimony of Iden and Theibert, as well as the application for insurance itself, clearly indicate that the binder would not have been extended without the required payment of twenty percent of the premium. Accordingly, even though a payment of a premium may not be required as a condition precedent to coverage, where the parties have an understanding that such payment is a condition precedent, the Court has no alternative but to deny coverage where payment is made with a worthless check.... [T]he mere delivery of the check by B.I.M. and acceptance of the same by American [Hardware could] not [be] considered payment until the check was paid....

> Accordingly, insofar as the defendant delivered a worthless check as consideration for the binder in question, the contract of insurance was void *ab initio* and no coverage was provided thereby.

> \* \* \* \* \* \*

> Finally, the defendant sets forth various arguments in support of its contention that American [Hardware] has waived [its right to immediate payment] or estopped from denying coverage under the [binder].... [T]he court is not convinced by any of said arguments. Suffice it to say that American [Hardware] conducted itself in a reasonable, businesslike manner in handling this matter. It attempted to present the check on two separate occasions, but was refused payment on each occasion. Rather than conducting itself in such a way as to waive its rights, it had instructed its agent, Theibert, to contact Iden and either secure proper payment or retrieve the application/binder. Before Theibert was able to contact Iden, the insured property was destroyed. Accordingly, the Court is of the opinion that American [Hardware] did not conduct itself in such a manner as to waive its right to deny coverage to the defendant.

*American Hardware Mut. Ins. Co. v. B.I.M., Inc.,* No. 85–0259–E(K), slip op. at 5–7 (N.D.W.Va. September 20, 1988). Having concluded that American Hardware was not liable on the binder, the court granted the insurer's motion for summary judgment.

This appeal followed.

## II

We turn first to the question of whether, as claimed, BIM's tender of a "worthless" premium deposit check presumptively voided *ab initio* all coverage under the American Hardware binder issued by agent Theibert on June 20, 1985.

As American Hardware would have it, there is a simple answer. Under West Virginia law, "[t]he premium is the price of the insurance and payment of the premium is of the essence of the insurance contract.

No payment—no insurance." *Nationwide,* 172 S.E.2d at 712 (quoting *Hare v. Connecticut Mut. Life Ins. Co.,* 114 W.Va. 679, 173 S.E. 772, 773 (1934)). Of course, "[a] worthless check is not a payment of anything," and " '[t]he mere giving or sending of a worthless check to the insurer does not effect the payment of a premium; the result being, if such a check is given for the first premium, that coverage never goes into effect.... [Thus, i]n order for a worthless check to constitute a valid payment, it must have been unconditionally accepted as such by the insurer.' " *Id.* (quoting 14 Appleman, *Insurance Law and Practice* § 8144. *See also, e.g., McCormick v. State Capital Life Ins. Co.,* 253 S.C. 544, 172 S.E.2d 308, 311 (1970) (following *Hare* ). As a matter of law, the company argues, BIM's tender of a worthless premium deposit check therefore amounted to a "failure of consideration," rendering any prospective insurance coverage void *ab initio.*

■ As BIM points out, however, different rules govern the determination of whether an insured party tendered sufficient consideration to fix his insurer's liability under a *binder.* "A 'binder' of insurance ... is a short method of issuing for the parties' convenience a temporary policy covering a described risk in return for a 'premium' payment to the insurer by the insured paid *or to be paid.*" *Great American Ins. Co. v. Fireman's Fund Ins. Co.,* 481 F.2d 948, 951 n. 6 (2d Cir.1973) (emphasis supplied). In most cases, therefore, the effectiveness of coverage under a binder is not conditioned on the payment of premiums. *Kellner v. Aetna Casualty & Sur. Co.,* 605 F.Supp. 331, 333 (M.D.Pa.1984). *See also, e.g., Carideo v. Phoenix Assurance Co. of New York,* 317 F.Supp. 607, 611 (E.D.Pa.1970); *Greene v. Commercial Union Ins. Co.,* 136 Ga.App. 346, 221 S.E.2d 479, 481 (1975). Instead, "[t]he agreement of the insured to take the policy and pay the premium [is] a sufficient consideration for the binder.... [T]he agreement to pay, express or implied, is all that is needed." *Pennsylvania Casualty Co. v. Upchurch,* 139 F.2d 892, 893 (5th Cir.1943).

■ We think it clear, however, that an insurer nevertheless may require the actual payment of a premium as a condition precedent to the issuance of a binder. "Promises to pay" constitute sufficient consideration to support binder coverage only in the *absence* of an agreement to the contrary, or a demand for the immediate tender of premiums. *See, e.g., Monsanto-fils v. Gacek Ins. Agency, Inc.,* 282 Or. 3, 576 P.2d 789, 790 (1978). *See generally* 12A Appleman, *Insurance Law and Practice* § 7227, at 154 (rev. ed. 1985). The necessary suggestion is, of course, that where the insurer has required a premium as consideration for the issuance of a binder, the insured's tender of a worthless check in satisfaction of the resulting "condition precedent" would render any apparent coverage void *ab initio. Cf. Nationwide,* 172 S.E.2d at 712. Thus, the dispositive question in this case is whether American Hardware indeed "required" that BIM tender a premium deposit as a condition precedent to the issuance of the binder.

■ On the merits of that question, and giving due consideration to the evidence before us, we must agree with the district court that there was no genuine issue of material fact with respect to American Hardware's threshold claim that "the binder would not have been extended without the required payment of twenty percent of the premium." *American Hardware Mut. Ins. Co. v. B.I.M., Inc.,* No. 85–0259–E(K), slip op. at 5 (N.D.W.Va. September 20, 1988). Iden explicitly conceded at his deposition that, when he and Theibert met on June 20th to execute the application and binder, Theibert had "required" that BIM tender a twenty percent premium deposit. Joint Appendix at 148. Theibert gave substantially the same account of the meeting. *Id.* at 309. The agent prepared a written chronology of the relevant events, moreover, which indicated that Iden had "paid a deposit for [BIM's] accounts, *which I [Theibert] needed in order to bind coverage.*" J.A. Exhibit 21 (emphasis supplied). Indeed, the deposition testimony of American Hardware underwriter Janet Cabe suggested that it was the company's policy to

require such deposits as a precondition to the issuance of *any* commercial insurance binders. *See* J.A. at 84, 90, 108 & 124.

Perhaps more importantly, there is in the record simply no evidence to substantiate BIM's responsive claim that, in this case, American Hardware would have made an exception to that policy and bound over coverage without the initial payment of a premium deposit. We therefore hold that, even taking the evidence in the light most favorable to BIM, the district court properly found on the summary judgment record no genuine issues of material fact with respect to the question of whether American Hardware required prepayment of a premium deposit as a "condition precedent" to issuance of the binder.

That does not, however, dispose of this case. As indicated, BIM also claims that American Hardware either waived or estopped itself from asserting "failure of consideration"—that is, nonpayment of the required premium deposit—as the basis for its ultimate refusal to honor the written binder. In turn, we must give separate attention to the question of whether, as BIM maintains, the summary judgment record admitted of genuine dispute as to the presence here of circumstances in which American Hardware could be said to have waived its presumptive right to declare the binder void *ab initio*.

### III

We start with several settled principles of the law of equitable estoppel. As a general matter, "[i]n order to support estoppel or waiver, a party must have been induced to rely on certain facts, and must have done so to his detriment." *Mundy v. Arcuri*, 267 S.E.2d 454, 456–57 (W.Va. 1980). "Detrimental reliance" is of course "essential to the assertion of waiver or estoppel," *National Mut. Ins. Co. v. McMahon & Sons*, 356 S.E.2d 488, 493 (W.Va.1987), and *"unwarranted* reliance will not invoke the application of estoppel." *Harris v. Criterion Ins. Co.*, 222 Va. 496, 281 S.E.2d 878, 881 (1981) (emphasis supplied). Thus, a party alleged to have waived its rights must contemporaneously

have known of the circumstances giving rise to a breach of the underlying contract. *Durham v. Cox*, 65 N.C.App. 739, 310 S.E.2d 371, 375–76 (1984). Similarly, "[t]he general rule governing the doctrine of equitable estoppel is that in order to constitute equitable estoppel or estoppel in pais there must exist a false representation or a concealment of material facts; it must have been made with knowledge, actual or constructive[,] of the facts; the party to whom it was made must have been without knowledge or the means of knowledge of the real facts; it must have been made with the intention that it should be acted on; and the party to whom it was made must have relied on or acted on it to his prejudice." *Greco v. Meadow River Coal & Land Co.*, 145 W.Va. 153, 113 S.E.2d 79, 85–86 (1960) (quoting *Stuart v. Lake Washington Realty Corp.*, 141 W.Va. 627, 92 S.E.2d 891, 893 (1956)).

At least so far as we are aware, the West Virginia Supreme Court has not had occasion to rule on the specific applicability of these rules in settings where an insured party seeks to avoid his insurer's presumed right to declare prospective coverage void on the basis of an apparent "failure of consideration." We are confident, however, that in cases such as this one, where the dispositive question is "whether the [insurer] has waived or is estopped from asserting forfeiture of the policy for nonpayment of premiums," the West Virginia courts would apply rules of decision closely tracking those adopted in other jurisdictions.

> "Waiver sometimes has the characteristics of estoppel and sometimes of contract, but it is always based upon an express or implied agreement. There must always be an intention to relinquish a right, advantage, or benefit. The intention to waive may be expressed or implied from acts or conduct that naturally lead the other party to believe that the right has been intentionally given up."
>
> \*   \*   \*   \*   \*   \*
>
> [Thus, a] waiver occurs where the [insurer] expressly or impliedly leads the in-

sured to believe it has given up a right under its policy; while estoppel results when the company leads the insured to believe that conformance to a course of action by the insured will prevent forfeiture of the policy.

*Thompson v. Northwestern Sec. Life Ins. Co.*, 44 N.C.App. 668, 262 S.E.2d 397, 400 (1980) (quoting *Klein v. Insurance Co.*, 289 N.C. 63, 68, 220 S.E.2d 595, 598–99 (1975)).

With these general principles in mind, and on the basis of the record now before us, we are persuaded that the district court too hastily granted the plaintiff's motion for summary judgment. The simple reason is that, in our view, genuine issues of material fact remained with respect to the dispositive question of whether American Hardware indeed waived or estopped itself from asserting BIM's failure to satisfy the conceded "condition precedent" to issuance of the written binder as grounds for declaring all purported coverage thereunder void *ab initio.* That cannot be said for all of BIM's waiver and estoppel allegations, however, and we therefore take up the individual claims *seriatim.*

### A

As indicated, BIM charges American Hardware and its agents with a number of discrete "acts" or "omissions" which, considered either together or in isolation, purportedly manifest an affirmative waiver of the presumptive "failure of consideration" we have already held was occasioned by the insured's tender of a worthless premium deposit check. Even were we to assume the truth of BIM's various factual allegations, however, we would nevertheless find several of the underlying claims insufficient to support the appellant's waiver and estoppel theories. We therefore turn first to those recorded "events" which, in our view, simply have no bearing on the question of whether American Hardware preserved its right to declare any prospective coverage under the June 20th binder null and void.

█ First off, we think it clear that any alleged actions undertaken by American Hardware prior to Central National's dis-

honor of BIM's premium deposit check— *viz.*, Theibert's June 20th issuance of a receipt for the check, and the Atlanta underwriting department's execution and delivery two days later of a "Certificate of Insurance"—cannot have constituted express or implied waivers, since at the relevant times the insurer did not yet have "knowledge of the breach." *See Durham*, 310 S.E.2d at 375–76; *Greco*, 113 S.E.2d at 85–86. All else being equal, American Hardware obviously would have had no reason to declare BIM's coverage under the binder void until such time as it became aware that the check was worthless. Only then did the insurer's "right" to disclaim all prospective, interim liability arise. Of course, if American Hardware had issued a payment receipt or certificate of insurance after Central National returned the deposit check, the case might well be different. Because it prepared and made available those documents without the benefit of actual or constructive "knowledge" of the operative facts, however, it cannot be said to have thereby waived or estopped itself from later asserting the underlying breach of contract as grounds for denying coverage under the binder.

In any event, BIM certainly can claim no greater rights under the certificate of insurance than it already enjoyed under the binder itself. By its terms, the certificate was "issued as a matter of information only and confer[red] no rights upon the certificate holder." J.A. Exhibit 8. Perhaps recognizing the general rule that "a certificate of insurance is not a contract of insurance but is merely the evidence that a contract has been issued," and that the validity of any certificate actually provided therefore "is conditioned upon the issuance and existence of a policy," 13A Appleman, *Insurance Law and Practice* § 7530, at 19 (rev. ed. 1985 & supp. 1987), BIM of course does not—and indeed cannot—now claim that the disclaimer found on the face of the certificate was ineffective. That said, and given that American Hardware simply could not have intended for the certificate to operate as a waiver of its right to declare the original binder void, we think it

plain that BIM cannot rely on the document as independent evidence of presumptive interim coverage.

■■■■■ For different reasons, we also reject BIM's claim that the preliminary, post-accident actions of American Hardware's attorneys somehow establish that the company affirmatively waived its right to declare the written binder void *ab initio*. Indeed, we think it simply irrelevant that counsel may have reached a "preliminary conclusion" that the company was in fact liable under the binder. "[T]he principles of estoppel and waiver do not operate to extend ... coverage ... after the loss has been sustained." *Insurance Co. of North America v. Nat'l Steel Service Center, Inc.*, 391 F.Supp. 512, 517 (N.D.W.Va.1975) (citing *Campbell v. Aetna Casualty & Sur. Co.*, 211 F.2d 732 (4th Cir.1954) (applying West Virginia law)), *aff'd mem.*, 529 F.2d 515 (4th Cir.1976). Thus, *post hoc* representations of an insurance company or its agents that a given policy covered a given loss will not estop the company from later denying coverage. *Cf. McGann v. Hobbs Lumber Co.*, 150 W.Va. 364, 145 S.E.2d 476, 482 (1965) (insurance agent's reassurances that policy covered recent loss do not bar insurer's later claim that terms of policy did not cover underlying risk). Of course, the corollary principle is that such representations also cannot constitute an affirmative waiver. In any event, the discovery record before us indisputably establishes that BIM did not become aware of the American Hardware attorneys' first-impression ruminations about the insurer's liability under the binder until well after the company filed the present lawsuit. That being the case, BIM simply cannot now claim that it in any sense "relied to its detriment" on counsel's alleged initial representations that the original binder covered the eventual loss.

### B

■■■ With respect to BIM's remaining claims, however, we are persuaded that the record admits of genuine dispute as to whether American Hardware may indeed have either expressly or impliedly waived—

or at least estopped itself from asserting—its right to declare the binder void.

At the heart of those claims lies an implicit suggestion that, both by delaying the processing of the June 20th application for permanent coverage and by failing to act promptly in response to Central National's July 30 notice that the premium deposit check had been dishonored, American Hardware led BIM and its representatives to believe quite legitimately that they need take no immediate action to remedy the obvious "failure of consideration." As BIM argues, that inference is necessarily bolstered by the record evidence suggesting that, on several occasions in late July and early August, agent Theibert repeatedly reassured Iden that a permanent policy would be forthcoming and that, until the Atlanta office forwarded a notice of final approval, the binder remained in effect. That said, what we believe the district court failed adequately to consider is the possibility that, taken together, American Hardware's apparent failure to act promptly and Theibert's later representations that the binder remained in effect were from BIM's perspective so unreasonable that they could now be found by a trier-of-fact to have constituted an affirmative waiver or estoppel of the insurer's presumptive right to claim that all interim coverage was void *ab initio*.

■■■■ It again bears emphasis that any waiver which occurred here was not an implied forfeiture of the insurer's obvious right to demand payment *per se*, but instead of its separate rights to demand immediate payment as a condition precedent to binder coverage, and later to assert the insured's failure to make such payment as the basis for denying coverage. That the summary judgment record in this case leaves open to question whether American Hardware should be charged with any such waiver necessarily follows, therefore, from the manifest applicability here of three settled principles of law: first, that waivers of "conditions precedent" to contractual liability need not be "express," but instead may be implied from the conduct of a party, *see, e.g., Thompson*, 262 S.E.2d at 400; *Royal*

*Atlanta Development Corp. v. M.D. Hodges Enterprises, Inc.*, 141 Ga.App. 838, 234 S.E.2d 676, 677 (1977); second, that an aggrieved party's right to rescind a contract for any fundamental breach must be asserted promptly, *see, e.g., Waldrop v. Bettis*, 223 Ga. 715, 157 S.E.2d 870, 874 (1967); and third, that even mere "silence" may, at least in some circumstances, constitute a binding waiver—or may estop the aggrieved party from later asserting a material breach as the basis for disclaiming ultimate liability under the contract. *See, e.g., Steinbrecher v. Jones*, 151 W.Va. 462, 153 S.E.2d 295, 302 (1965); *Fisher v. West Virginia Coal & Transp. Co.*, 137 W.Va. 613, 73 S.E.2d 633, 640 (1952).

With these principles in mind, we think several material questions remain open to dispute on the present record. The evidence here arguably suggests, for example, that American Hardware's failure promptly to process BIM's application for permanent coverage—and more importantly, to act immediately in response to Central National's notice that the premium deposit check had been dishonored—was not only unwarranted, but could "reasonably" have led Iden and BIM's other representatives to believe that the initial "failure of consideration would *not* result (at least immediately) in cancellation of the interim binder. In the course of discovery, BIM was able to obtain evidence that American Hardware normally processed applications for permanent insurance in only two to three weeks, and that it typically requested substitute payment when premium checks were dishonored within a matter of days. Indeed, the terms of the application itself indicated that American Hardware would normally substitute a permanent policy for any "bound over" coverage after no more than thirty days. On the basis of this and similar evidence, we think a reasonable trier of fact could conceivably conclude that American Hardware imposed on itself a "duty to speak" more quickly than it did; that the company's prolonged silence constituted a violation of that duty; and that the insurer thereby waived BIM's failure to satisfy the suggested "condition precedent" to coverage under the binder. *See Fisher*, 73

S.E.2d at 640 (individual "facts and circumstances" of a given case may suggest that contracting party operated under or imposed on himself a "duty to speak," in which case "silence" may result in later estoppel).

We of course recognize that BIM ultimately must establish by "clear and convincing" proof that American Hardware was indeed duty-bound to act with greater dispatch than it did. *Id.* Our only holding is, therefore, that the record here leaves the matter open to genuine dispute. That said, American Hardware would nevertheless have us find that BIM failed to put in issue the essential "detrimental reliance" element of any waiver or estoppel claim. *See McMahon*, 356 S.E.2d at 493. We think it clear that on that issue, however—which is necessarily intertwined with the separate but equally disputable question of the "reasonableness" of *both* parties' actions—BIM's conceded failure to take steps to remedy its threshold breach might be viewed on the evidence as a "detrimental" choice made in "reliance" on either American Hardware's silence or, as will appear, its agent's affirmative representations. The only point is that, to establish a binding waiver, BIM need only establish that it failed to act *in reliance on* a reasonably held belief, induced of course by American Hardware's acts or omissions, that the company had "given up a right under [the] policy"—just as, to invoke successfully the doctrine of equitable estoppel, BIM need show no more than that its failure to remedy the underlying breach was induced by acts whereby American Hardware led the insured "reasonably" to believe that no action was required to prevent forfeiture of all coverage under the binder. *Thompson*, 262 S.E.2d at 400. The record here permits inferences of precisely that sort, and for that reason alone we cannot agree with the district court that BIM's waiver and estoppel claims were subject to ready disposition on summary judgment.

■ Further indicating the existence of genuine issues respecting BIM's claims of waiver or estoppel is the evidence that agent Theibert repeatedly reassured Iden

in late July or early August that the June 20th binder remained in force, and that approval of BIM's permanent policy was forthcoming. American Hardware of course argues that, inasmuch as Theibert indisputably was not aware that the premium deposit check had been dishonored until he spoke with underwriter Janet Cabe on August 19th, these alleged representations cannot have constituted a "knowing" waiver. *See Durham*, 310 S.E.2d at 375–76; *Greco*, 113 S.E.2d at 85–86. We disagree. Proof of "knowledge" is obviously a prerequisite to the successful assertion of any waiver or estoppel claim; but either "actual *or* constructive [knowledge] of the [material] facts" will normally suffice. *Greco*, 113 S.E.2d at 85 (emphasis supplied). Here, notwithstanding that Theibert apparently had no actual knowledge of the Central National notice of dishonor, evidence in the record arguably suggests that he still should have known—or conversely, that the American Hardware home office should have made him aware—of the purported "failure of consideration." Indeed, we think a reasonable trier of fact could reach such a conclusion solely on the basis of the record evidence indicating that nearly three weeks elapsed between the time when American Hardware first became aware that the deposit check had been dishonored and the date on which underwriter Cabe ultimately called Theibert to inform him that the company intended to issue a notice of cancellation. Moreover, and as BIM points out, Theibert arguably should have become aware that the Tennerton Plaza deposit check would be dishonored when, on August 2, 1985, he learned of and then discussed with Iden the dishonor of a separate deposit check Iden tendered on June 20th for unrelated, personal lines of insurance. This separate item was drawn on the same account as the check tendered for the BIM account—suggesting of course that Theibert could easily have surmised that the former was as worthless as the latter.

To the extent that, on the basis of this and similar evidence, Theibert can be said to have had "constructive" knowledge of the "operative facts," a jury could in turn find that his repeated reassurances consti- tuted a waiver on which BIM was entitled to rely. American Hardware argues vigorously that any such reliance was undeniably "unwarranted," *see Harris*, 281 S.E.2d at 881, inasmuch as Iden was himself aware that the BIM deposit check had been dishonored. That claim, however, touches on the fundamental "reasonableness" of *both* parties' actions—a question we have already held is open to dispute on the summary judgment record now before us. It will in turn be for the trier of fact alone to resolve whether, as claimed, agent Theibert's representations are chargeable to his employer—and whether they indeed constituted a waiver of American Hardware's right to declare the binder void for "failure of consideration."

■ Finally, we think the record also leaves unsettled the question of whether, as BIM claims, Theibert's "reassurances" amounted to the separate extension of "oral binders" whose effectiveness was not conditioned on the valid prepayment of a premium deposit. Under West Virginia law, "[b]inders or other contracts for temporary insurance may be made orally or in writing," W.Va.Code § 33–6–18, and courts have long recognized that "[n]o specific form … is necessary to constitute … an oral communication, intended as a binder, a valid contract of insurance." *Mayo v. American Fire & Casualty Co.*, 282 N.C. 346, 192 S.E.2d 828, 833 (1972). The simple difficulty here is that there is no evidence in the record to illuminate whether Theibert might have affirmatively intended to extend a "new" binder, or instead simply to reaffirm the validity of the interim coverage bound over in late June. If the parties understood the June 20th binder to have expired by its terms, and if they in turn treated Theibert's July and August "representations" as substitute oral binders, American Hardware would presumably have been required to issue a separate "Notice of Cancellation" under W.Va.Code § 33–22–15(c) before it could declare any coverage provided by such binders null and void. Of course, the company concedes that it issued no such notice. American Hardware's ultimate liability for the Ten-

nerton Plaza loss might also turn, therefore, on disposition of the as yet unresolved question of whether the circumstances surrounding Theibert and Iden's telephone conversations justify an inference that new "oral binders" were indeed extended.

### IV

In summary, then, we hold that the discovery record developed below leaves open to genuine dispute the dispositive questions of whether, in connection with either American Hardware's alleged failure to "act promptly," agent Theibert's purported representations that the binder remained in effect, or both, the plaintiff indeed waived its right to "immediate payment" as a condition precedent to coverage or, in the alternative, estopped itself from asserting "failure of consideration" as the basis for its ultimate denial of liability under the June 20th binder. These issues—together of course with the also unresolved questions of whether American Hardware may have extended separate "oral binders," and whether it was thereby obliged to issue a formal "Notice of Cancellation"—may now be settled only at trial. We therefore will vacate the district court's summary judgment order and remand the case for further proceedings.

For all of the above reasons, the district court's order granting summary judgment in favor of the plaintiff is vacated and the case remanded for further proceedings consistent with this opinion.*

VACATED AND REMANDED.

---

\* We also have before us an appeal from the district court's post-judgment denial of a Rule 24 motion to intervene filed by various former tenants of the destroyed shopping center. It would appear, moreover, that the Cherry River National Bank, which held a deed of trust on the Tennerton Plaza property, may also seek to intervene. The district court apparently denied the tenants' motion on the ground that its earlier order granting American Hardware's motion for summary judgment resolved the dispute in its entirety and mooted any claims that the tenants might assert.

Without expressing any opinion on the merits of any intervention motions which have been or will be filed in this case, we need only suggest to the district court that, in light of our disposition of BIM's direct appeal, any interested parties should be afforded a full opportunity to move for intervention, either "as of right" or with the court's permission, before further proceedings commence. Because we think that question should now be addressed in the first instance by the district court on remand, we decline to rule on the present intervenors' appeal.