## Richmond

### JAMES HARRIS

### V.

### CRITERION INSURANCE COMPANY

September 11, 1981.

Record No. 790702.

Present: All the Justices.

*Stephen A. Strickler (John W. Eppler; Doumar, Pincus, Knight & Harlan,* on brief), for appellant.

*B. Thomas Reed (William H. Harris; Taylor, Gustin, Harris, Fears & Davis,* on brief), for appellees.

COMPTON, J., delivered the opinion of the Court.

In this automobile insurance case in which the insurer had cancelled a policy for nonpayment of premiums, we consider whether the insurer was estopped to deny coverage under the policy.

Appellant James Harris was the named insured in a "Family Automobile Policy" containing liability and physical damage coverage issued by appellee Criterion Insurance Company. The insured filed a motion for declaratory judgment below against the insurer and others seeking an adjudication that the policy was in full force and effect at the time of a 1976 accident which caused personal injuries and property damage. Following a bench trial, the court determined the insurer was "not obligated to provide insurance coverage" to Harris on the day of the accident. From this February 1979 judgment in favor of Criterion, we granted the policyholder an appeal.

For the most part, the facts are undisputed. During the period 1969 to 1975 Criterion issued policies of automobile insurance covering vehicles owned by Harris, who resided in Norfolk. The premiums were always paid by mail in installments. Utilizing computerized procedures in its Washington, D.C. office, the insurer would mail premium notices to Harris. If the installments were not paid when due, notices of cancellation were sent which advised the insured that the policy "is hereby cancelled" on a specific date in the future. Such notice also stated that payment of the past due premium amount before the cancellation date would "void" the cancellation notice and keep the policy in effect. Premium payments were processed by the insurer's data processing equipment.

Under the insurer's standard operating procedure, if a premium payment was "posted" with the computer within ten days after the cancellation date, the cancellation notice would automatically be "voided" and uninterrupted coverage would be provided by Criterion. On the 11th day after the effective date of the cancellation, the computer "physically" cancelled the policy if the past due premium payment had not been received. If, however, a premium payment was posted more than ten days after the cancellation date, the computer "generated a flag" to the insurer's Collec-

tions Division. Upon receiving this information that the policy had been cancelled and that "cash has been received" the Collections Division reviewed the policyholder's insurability in accordance with standards established by the insurer's Underwriting Department.

If a decision was made to provide coverage, the insurer notified the policyholder by letter that his remittance had been received after the effective policy cancellation date. The letter further advised that the Underwriting Department had approved "re-establishment of coverage under the policy," and that the coverage had lapsed, being void from the cancellation date to the date the premium payment was posted by the computer. A "premium reduction credit" was allowed for the period that coverage was lapsed. Alternatively, the Collections Division, relying on the underwriting directions, could determine that coverage should not be reinstated, in which case the former insured's unearned premium would be refunded.

In February of 1976, the Underwriting Department adopted a new general internal policy with reference to late receipt of premium payments. Although the record is not completely clear on this point, this new policy apparently applied only to late premium payments posted more than ten days after the cancellation date. Under the new policy, if two or more cancellation notices had been mailed to the insured during the policy year, then the Collections Division was to refuse to accept late payments and was to return the amount to the former insured.

The following facts generated the present litigation. A notice of cancellation was mailed from Washington to Harris in Norfolk on April 1, 1976, specifying April 25, 1976 as the effective date of cancellation. Payment of the $34.41 that was due was not received by the insurer and the policy was cancelled by the computer on May 6, 1976, effective 12:01 a.m. April 25, 1976. Harris testified he purchased a money order for $34.41 in Norfolk on April 25 and mailed it either that day at 7:00 p.m. or "some days" after he bought it. The late payment was posted by the computer on May 7, twelve days after the cancellation date. The accident in question happened in Norfolk on May 9. Harris reported the accident by telephone, presumably to a Criterion office in the Tidewater area, on May 10. The Collections Division in Washington received computer information on May 10 that the policy had been cancelled and that a premium payment had been received. Employing

the new underwriting policy and unaware of the accident, Collections determined that the policy should not be reinstated because at least 4 cancellation notices had been sent to Harris during the current policy year which began on June 5, 1975.

By letter dated May 12, 1976, Harris was notified from Criterion's Virginia Beach office that it was investigating the accident without waiving any of its rights under the policy, for the reason that the policy expired on April 25 for "non-payment of a due premium." By check dated May 19, Criterion refunded the premium payment of $34.41.

During the period of time Harris was insured by Criterion, at least 11 cancellation notices were sent to him because of nonpayment of premiums. The evidence showed he submitted payment before the cancellation date at least once, in December 1975. On at least seven other occasions, Harris tendered his payment within ten days of the cancellation dates which, under the insurer's procedure, continued coverage without interruption and "voided" the respective cancellation notices. Upon the remaining three occasions, in March 1972, October 1972 and June 1975, the premium payments were posted more than ten days after the cancellation dates. On each of these occasions, Criterion cancelled the policy but, upon reviewing his insurability, reinstated the policy with a lapse in coverage, and so notified Harris. The insurer never provided Harris with continuous coverage when a late payment was posted more than ten days after the cancellation dates.

On appeal, Harris points to the evidence which shows that during the period 1969 to 1976 he made numerous payments of premiums that were "received and cashed" by Criterion after the purported date of cancellation. He says that in each instance, depending upon when the payment was received, the insurer either continued the policy in effect or reinstated the policy with a lapse. Citing text and foreign authority, Harris contends that the customary receipt of his late payments induced him to believe that he could properly tender payments late and that a forfeiture of his policy benefits would not result from a short delay in the payment of premiums. Therefore, he urges, Criterion is estopped from insisting on a forfeiture for a delay induced by its course of conduct. We disagree.

Manifestly, the insurer had a right to terminate the contract of insurance without the insured's consent by complying with the terms of the policy and with the applicable statutory provisions

relating to cancellation. *State Farm Ins. Co. v. Pederson,* 185 Va. 941, 948, 41 S.E.2d 64, 66 (1947). Both the instant policy and the applicable statute, Code § 38.1-381.5(d)(2), contain identical language permitting cancellation when the "named insured fails to discharge when due any of his obligations in connection with the payment of premium" for the policy "or any installment thereof." And there was no dispute that Criterion followed the detailed procedure for achieving cancellation specified by the policy and the applicable statutory provisions. Consequently, a late premium payment received after cancellation of the policy had become effective was but a mere offer by the former policyholder to make a new contract of insurance which required acceptance by the company in order to constitute a binding contract. Thus, an after-cancellation loss was not covered by the policy unless, under the argument here, the insurer was estopped by its conduct to deny the coverage.

■ The doctrine of estoppel applies only when the insured can prove he justifiably relied on the insurer's conduct and was thus misled by the company's behavior into believing the policy was still in force. 185 Va. at 953, 41 S.E.2d at 69; *State Farm Mutual Auto. Ins. Co. v. Robison,* 11 Ariz.App. 41, 45, 461 P.2d 520, 524 (1969). Unwarranted reliance will not invoke the application of estoppel. 16B J. Appleman, *Insurance Law and Practice,* § 9088 at 565 (1981). And the party relying on estoppel must prove each element by "clear, precise and unequivocal evidence." *Employers Ins. Co. v. Great American Ins. Co.,* 214 Va. 410, 415, 200 S.E.2d 560, 564 (1973), quoting *John Hancock Mutual Life Ins. Co. v. Virginia National Bank,* 212 Va. 31, 33, 181 S.E.2d 618, 620 (1971). The evidence of the insured fails to sustain the foregoing heavy burden of proof.

Even though Harris testified he thought his insurance coverage was in effect after April 25, 1976, because of the insurer's past conduct and because he "never seen no letter from nobody" advising him that his automobile was not covered after that date, the evidence utterly fails to show he was justified in so relying. As a matter of fact, the evidence is abundant to support the proposition that any such reliance was completely unwarranted.

Harris failed to pay attention to the procedure and course of dealing applied by Criterion to his delinquent premium payments. Had he been attentive, he would have been apprised of Criterion's standard operating procedure consistently followed in its dealings

with him. In strict compliance with the advice given in each cancellation notice, coverage was continued without interruption, and without further notice to the insured, whenever a past due amount was paid before the cancellation date. In addition, if such payment was received within ten days of such date, the company's procedure was to continue coverage without lapse and without further notice to the insured. But if any delinquent payment was received more than ten days after the cancellation date, and coverage was reestablished with a lapse, the insured was notified in writing and a "premium reduction credit" was allowed. Of course, as with the last delinquent payment, if the insurer decided not to reestablish coverage, no further notice of cancellation was sent except refund of the premium payment. Indeed no such additional notice was required by the policy or statute.

We perceive nothing in the insurer's operating procedure that would justify Harris in believing that a delinquent payment, no matter how late it was made, would always be accepted by the insurer without interruption in coverage. The procedure was reasonable, utilizing data processing, and was geared to accomplish prompt collection of premium payments while at the same time affording some flexibility to avoid arbitrary cancellation of coverage. In short, because of his habit of operating with the insurer's money, Harris gambled with his coverage and lost.

We likewise reject Harris' alternative arguments that the insurer is estopped because it failed to notify him of the 1976 change in the underwriting policy and because it cashed the April money order. The insurer was not required by the insurance contract or otherwise to furnish Harris notice of any new internal operating procedure. Moreover, there is no evidence Harris knew the specifics of the old procedure, or that he relied on it even if he knew about it.

Finally, mere computer posting and subsequent negotiation of a money order representing the amount of a delinquent premium payment, without more, does not give rise to an estoppel when, as here, the sum is refunded within a reasonable time. Notice of cancellation, when furnished under the terms of the policy and the applicable statute, terminates the policy ipso facto, and the obligation to return the unearned premium merely creates a debtor-creditor relationship. *Ampy* v. *Insurance Company*, 200 Va. 396, 401, 105 S.E.2d 839, 844 (1958). The insurer was under no obligation to remit the tendered amount at the time of cancel-

lation because return of the unearned premium is a consequence of and not a condition precedent to the cancellation. *Id.* The premium here was refunded 12 days after being posted by the computer. This was within a reasonable time and in accordance with the policy provisions that required the premium adjustment to be made "as soon as practicable" after cancellation became effective.

The facts of the present case are in marked contrast to the situations in the cases of *Home Beneficial* v. *Field,* 162 Va. 63, 173 S.E. 370 (1934), and *Pennsylvania Threshermen* v. *Carter,* 197 Va. 776, 91 S.E.2d 429 (1956), relied on by Harris. In *Field,* the insurer unconditionally accepted cash premium payments on a policy already forfeited. 162 Va. at 69, 173 S.E. at 373. In *Carter,* the insurer's local agent accepted a late cash premium payment and delivered a renewal policy; also, the insurer used information furnished by the insured, rated the policy and retained a part of the premium paid. 197 Va. at 777, 780, 91 S.E.2d at 431, 432.

For these reasons, we hold the trial court did not err in finding in favor of the insurer. Accordingly, the judgment below will be

*Affirmed.*