**Janet and Daphne HAMMOND, as Personal Representatives of the Estate of Marjorie Hammond; M.H.H. Irrevocable Trust; Janet Hammond; and Daphne Hammond, Plaintiffs,**

v.

**PACIFIC MUTUAL LIFE INSURANCE COMPANY, Defendant.**

No. Civ.A. 01–386–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Aug. 23, 2001.

Meredith Nicole Long, The Falk Law Firm, Washington, D.C., for plaintiffs.

Jeff Wayne Rosen, Pender & Coward, Virginia Beach, VA, for defendant.

### MEMORANDUM OPINION

ELLIS, District Judge.

In this diversity action to recover on a life insurance policy, two questions are presented by the parties' cross-motions for summary judgment: (i) whether the policy in issue included a condition precedent to its effectiveness that was applicable in the circumstances at bar; and (ii) whether, in the circumstances at bar, Virginia Code § 38.2–3304(B)(2) allows the insurer to deny plaintiffs' claim by using the insured's answers on a health questionnaire submitted in connection with the application for the policy.

### I.

On January 14, 1997, the late Marjorie Hammond ("Hammond") signed a document entitled "APPLICATION FOR LIFE INSURANCE, PART I" ("Part I") that was presented to her by Agent Michael Mullen, with whom Hammond had been consulting with respect to planning her estate. Hammond was seeking to apply as the proposed insured for life insurance coverage with a trust as the beneficiary and plaintiffs Janet and Daphne Hammond ("plaintiffs") as the trustees. The life insurance policy was to be issued by defendant Pacific Mutual Life Insurance Co. ("Pacific Life"), a California corporation that provides, *inter alia*, life and health insurance products. At the time Hammond signed Part I, it was not possible to complete the application form because the beneficiary trust had not yet been formed. Thus, the application did not include the required trust information and the trustees' signatures. In addition, Hammond did not date her signature on Part I, presumably because the trustees' signatures and trust information had yet to be provided. Accordingly, the application, although signed by Hammond on January 14, was incomplete at that time.

The life insurance application Hammond signed was for a policy that provided a death benefit of $750,000.00, with an annual premium of nearly $30,000. Part I of

the application included a declarations section that contained the following provision:

I represent that the foregoing answers and statements contained in Parts I and II are correctly recorded, complete, and true to the best of my knowledge and belief. I understand that:

1. Except as otherwise provided in any Temporary Insurance Agreement, no insurance will take effect before the policy for such insurance is delivered and the first premium paid during the lifetime(s) and before any change in the health of the Proposed Insured(s). Upon such delivery and payment, insurance will take effect if the answers and statements in this application are then true.

Shortly after Hammond signed Part I in January 1997, Agent Mullen sent a copy of the signed, undated, Part I application to Pacific Life's Home Office in California ("Home Office"), but retained the original application. The Home Office received Part I and a medical release form on January 22, 1997.

As part of the application process, Hammond was required to have a physical examination and to complete a medical questionnaire. In this regard, Pacific Life sent a medical professional to Hammond's home on January 22, 1997 to perform blood and urine tests and an EKG. Furthermore, Hammond received assistance in completing a document entitled "APPLICATION, PART 2 TO PACIFIC MUTUAL LIFE INSURANCE COMPANY MEDICAL" ("Part 2").[1] As part of her responses to the questions in the Part 2 form, Hammond informed Pacific Life that she was a 5'2" tall, 92–pound, 73–year–old, ½ pack-per-day smoker; that she had last seen Dr. Maureen O'Regan, a gynecologist, approximately two to three months earlier regarding estrogen replacement; and that she had been treated by Dr. Leo Van Herpe for osteoporosis and hip fractures. And, in response to Question 4, which asked whether, during the past ten years, Hammond (i) had, (ii) had been told she had, or (iii) had been treated for "[h]oarseness or cough, blood spitting, asthma, pneumonia, emphysema, tuberculosis, or other respiratory system disorder" or "[c]ancer, cyst, tumor or disorder of skin, blood or lymph glands," Hammond answered "no." Furthermore, in response to Question 7, which asked whether, in the past five years, Hammond (i) "[h]ad a checkup, consultation, illness, injury or operation," (ii) "[h]ad an electrocardiogram, blood test, or other test or x-ray," or (iii) had "[b]een advised to have any diagnostic test, hospitalization or surgery which was not completed," she listed a May 1996 visit to the Mayo Clinic with normal results for an EKG, labs, a CXR, and a mammogram. In addition to providing these answers, when Hammond signed the Part 2 form, she acknowledged that her "statements and answers [to this form] shall be a part of the application" for life insurance. After completing the examination and obtaining the test results, the medical professional mailed the medical documents and the

---

1. The parties dispute the significance of the fact that this medical form was labeled "Part 2," rather than "Part II," which is the nomenclature used for the medical form in the Part I application that Hammond signed. Pacific Life claims there is no significance to the different references; both are medical forms used interchangeably. Plaintiffs claim that a Part II form is different from the Part 2 form and is entitled "APPLICATION, PART II TO PACIFIC MUTUAL LIFE INSURANCE COMPANY NON–MEDICAL," a sample of which is included in the record. In the circumstances, this dispute is no bar to summary judgment because it is undisputed that Hammond completed only a medical form labeled "Part 2," and thus it is clear that the reference in the application to "Part II" refers to the Part 2 that Hammond completed.

Part 2 form to Pacific Life, which received the documents at the Home Office on January 27, 1997.

On May 30, 1997, Agent Mullen returned to Hammond's home to have the life insurance application completed. By this time, the beneficiary trust had been formed, naming plaintiffs as trustees. Acting in their trustee capacities, plaintiffs, as applicants and owners of the policy, signed the original Part I form that Hammond signed as the proposed insured in January 1997. Although present, Hammond did not execute, initial, or otherwise make a mark on any document on May 30, 1997. And, at no time during the May 30 meeting did Mullen either have or provide Hammond or plaintiffs with a copy of the Part 2 medical forms dated January 22, 1997, nor did he affirmatively represent to Hammond or plaintiffs that Pacific Life would be relying on answers Hammond provided on the Part 2 form she completed on January 22. Mullen accepted the now fully signed Part I application, as well as a premium check for $29,930, both of which were promptly sent to Pacific Life's Home Office. The completed application was dated May 30, 1997. Thereafter, on June 3, 1997, Pacific Life issued a policy that Mullen hand-delivered to Hammond and plaintiffs on June 11, 1997. The parties dispute whether the completed Part 2 form was attached to the policy at the time of delivery.

On November 15, 1997, Hammond died. After receiving plaintiffs' claim for benefits, Pacific Life reviewed Hammond's medical records and learned that, between the January 22, 1997 medical consultation and May 30, 1997, Hammond had consulted with several physicians who, *inter alia,* (i) noted "emphysematous changes" in Hammond's health, (ii) diagnosed Hammond as having chronic obstructive pulmonary disease and anemia, and (iii) suspected that she had myelodysplasia, a disease of the bone marrow, and thus scheduled her for a bone marrow biopsy.[2] Because Pacific Life believed that Hammond had a duty to disclose any significant changes in her health and to amend her responses to the questions in the Part 2 form, the company denied coverage by letter dated May 8, 1998.

On March 9, 2001, plaintiffs filed a six-count complaint stating claims against Pacific Life for: (i) breach of contract (Count I), (ii) promissory estoppel (Count II), (iii) equitable estoppel (Count III), (iv) common-law fraud (Count IV); (v) negligence/gross negligence (Count V); and (vi) bad faith (Count VI). Defendant thereafter moved for summary judgment on all six counts of the complaint, and plaintiffs, in turn, moved for partial summary judgment on their breach of contract claim (Count I), and also moved to strike defendant's affirmative defense of material misrepresentation. By Order dated July 9, 2001, summary judgment was granted in favor of defendant as to Counts II–VI, and plaintiffs' motion to strike defendant's affirmative defense of material misrepresentation was denied. *Hammond v. Pacific Mut. Life Ins. Co.,* Civil Action No. 01–386–A (E.D.Va. July 9, 2001) (Order). Thus, only the parties' cross-motions for summary judgment as to Count I remain for disposition. *See id.*

## II.

Pacific Life moves for summary judgment on the grounds that (i) a condition precedent to the insurance contract taking

---

**2.** Hammond was subsequently diagnosed with multiple myeloma, a form of bone can-cer.

effect was not met, and (ii) plaintiffs breached their duty of fair dealing by failing to disclose the changes in Hammond's health. Plaintiffs, in turn, move for summary judgment on Count I on the grounds that (i) the condition precedent was inapplicable to the Hammond policy, (ii) Pacific Life waived the condition precedent, and (iii) Pacific Life is precluded by Virginia Code § 38.2–3304(B)(2) from denying coverage on the basis of any statements in Hammond's medical questionnaire because the Part 2 form was not attached to the policy when it was issued by the insurer or when it was delivered to the plaintiffs.

### A.

■ Central to the resolution of both summary judgment motions is whether a condition precedent to the effectiveness of the policy existed and was met. In Virginia,[3] it is established that "[a] condition precedent calls for the performance of some act, or the happening of some event after the terms of the contract have been agreed upon, before the contract shall take effect." *Smith v. McGregor*, 237 Va. 66, 376 S.E.2d 60, 65 (1989). In other words, a condition precedent exists where "the contract is made in form, but does not become operative as a contract until some

future specified act is performed, or some subsequent event occurs." *Morotock Ins. Co. v. Fostoria Novelty Co.*, 94 Va. 361, 26 S.E. 850, 852 (1897). In this regard, it is well-settled that "good health" provisions in insurance contracts[4] are valid and enforceable as conditions precedent to a life insurance policy taking effect.[5]

■ The provision in the policy application here in issue fits squarely within the established definition of a valid "good health" provision under Virginia law. By its plain terms, this provision "calls for the performance of some act, or the happening of some event" before the contract is to become effective. *McGregor*, 376 S.E.2d at 65. Specifically, the provision states that the policy does not become effective unless (i) it is delivered and (ii) the first premium is paid *before* there is any change in the proposed insured's health. Under this provision, therefore, it is quite clear that Pacific Life's policy would not become effective in the event Hammond's health changed between the time of the application and the time the policy was delivered and the premium paid. This is a classic "good health" condition precedent that courts, applying Virginia law, have found valid and effective to bar recovery on a policy.[6] There is, therefore, no doubt that

---

**3.** Virginia law applies here because Virginia's choice-of-law rules control in this diversity action, *see Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), and the pertinent choice-of-law rule requires application of Virginia law given that the contract was entered into and delivered to Hammond and plaintiffs in Virginia. *See Capers v. White*, 195 Va. 1123, 81 S.E.2d 597, 600 (1954) (finding that a life insurance policy is governed by the law of the state where the insurance contract is entered into).

**4.** Good health provisions "protect insurers from assuming a risk that arises between the time of the application and the final act necessary to create a contract of insurance." 1 Lee R. Russ et al., Couch on Insurance § 15:1

& n. 3 (3d ed. 1996 & Supp.2000) (collecting cases).

**5.** *See id.; Hayes v. Durham Life Ins. Co.*, 198 Va. 670, 96 S.E.2d 109, 111 (1957) (finding valid a provision in the application that the applicant was not protected unless and until a policy of insurance was issued and delivered to him during his lifetime and while he was in good health.).

**6.** *See, e.g., Combs v. Equitable Life Ins. Co. of Iowa*, 120 F.2d 432 (4th Cir.1941); *Gustafson v. Southland Life Ins. Co.*, 885 F.Supp. 854 (E.D.Va.1995); *Webb v. Unum Life Ins. Co. of Am., Inc.*, 1996 U.S.Dist. LEXIS 10846 (E.D.Va. July 12, 1996). In *Combs*, for example, the Fourth Circuit, applying Virginia law,

there was a valid condition precedent to the effectiveness of the Pacific Life policy. Given this, *if Pacific Life is entitled to rely on Hammond's statements on Part 2,* the policy did not become effective, because it is also clear that Hammond's health changed between January 22, 1997, when she completed the Part 2 form, and the time when the policy was delivered and the premium paid.

■ Seeking to avoid this conclusion, plaintiffs offer four arguments, none of which is persuasive. Plaintiffs' first argument is that the condition precedent was met in this case because two applications for insurance were submitted—one in January 1997 that Pacific Life "declined" and the other in May 1997—and the Part 2 form was only part of the January applica-

tion.[7] In support of this assertion, plaintiffs refer to Pacific Life's administrative closure of Hammond's application file, of which neither Hammond nor plaintiffs were informed at the time. This argument fails because the critical issue is not the manner in which Pacific Life administratively handled the application, but whether the information given and gathered throughout the process was treated as part of the same application. Indeed, the Supreme Court of Virginia has held that an insurer's internal procedures are irrelevant to a determination of contracting parties' duties in the absence of evidence that the plaintiff knew about the procedures and relied upon them.[8] No such evidence exists here. So far as plaintiffs and Hammond were concerned, a single application

---

. held that the insured's discovery, after the submission of the application but before issuance of the policy, that he had a serious lung condition—a condition not disclosed in the insurance application—prevented the insurance contract from taking effect, for the contract provided that "the company shall incur no liability ... until said policy is delivered to me and the entire first premium therefor is actually paid while I am in good health." 120 F.2d at 434. Similarly, in *Gustafson,* the application provided that the insurance was not to take effect until

> this application has been approved[,] ... the policy has been delivered to and accepted by the Owner, and ... the first full premium ... has been paid while all persons proposed for insurance are alive and while the health and insurability of such persons has not changed from that as described in this application.

885 F.Supp. at 859. Given this provision, the district court held that the applicant, who after completion of the application but before payment of the first full premium, underwent a chest x-ray that revealed abnormalities, failed to satisfy a condition precedent to the policy taking effect. *See id.* And, in *Webb,* the district court granted summary judgment to the insurer on the ground that the insured, by failing to disclose that after applying for disability insurance but before delivery and payment of the policy he consulted with two

physicians about chest and abdominal discomfort and underwent diagnostic tests, failed to satisfy a condition precedent of the policy, which provided that "[i]nsurance will be effective ... provided that, on the later of the delivery date or payment date, the answers in this application and in any supplementary application, medical exam or other questionnaire are then still true and complete." 1996 U.S.Dist. LEXIS 10846, at *7–8.

7. In January 1997, Hammond signed Part I forms that had a preprinted number, 791698. When Pacific Life's Home Office received a copy of these forms, it created an application file for policy no. 1A23196770. The Home Office administratively closed this application file on or about April 1, 1997. In May 1997, plaintiffs signed and submitted the same Part I forms, bearing the preprinted 791698 number. After the Home Office received the completed forms, it created an application file with a different policy no.: 1A23245420. The policy that was issued to Hammond and plaintiffs bore this second number.

8. *See Harris v. Criterion Ins. Co.,* 222 Va. 496, 281 S.E.2d 878, 882 (1981); *Nyonteh v. Peoples Sec. Life Ins. Co.,* 958 F.2d 42, 46 (4th Cir.1992) (holding that "internal procedures" that were not followed "had no bearing on the existence of contractual relations between the parties").

process was commenced in January 1997 and completed on May 30, 1997: the exact same Part I form that Hammond signed in January was signed and submitted by plaintiffs in May. Hammond's signature on the Part 2 form acknowledged that her statements on that form were part of the application. And Pacific Life clearly relied on the Part 2 form and medical examination completed in January for its determination that insuring Hammond presented an acceptable risk. Plaintiffs' post-hoc characterization of the process as two applications is unpersuasive; Pacific Life's internal procedures are immaterial to the validity of the condition precedent.

No more persuasive is plaintiffs' second argument that any condition precedent to the insurance contract would only have run from the date the application was completed to the date of receipt of the first premium—which, in this instance, was the same date. Accordingly, plaintiffs argue, the condition was certainly met, since Hammond's health did not change during that day. Central to plaintiffs' argument is that the condition precedent is ambiguous and may be read to limit its application to the time period between the completion of the application, which occurred on May 30, 1997 and the payment of the first premium, which occurred on the same day. While it is well-settled that ambiguous language in an insurance policy should be given an interpretation that grants coverage, rather than one that withholds it,[9] this principle of construction has no application where, as here, there is no ambiguity in the condition precedent. This condition precedent clearly states that the policy will take effect only if "the answers and statements in this application are . . . true," and remain so through the delivery of the policy *and* the payment of the first premium.

Even if plaintiffs' arguments on timing were to be accepted, the answers on the Part 2 form were not true on May 30 and the condition precedent would not be satisfied. Accordingly, if Pacific Life is entitled to rely on the Part 2 form, plaintiffs' second argument fails because the condition precedent cannot be satisfied unless the information contained in the Part 2 form, which is a necessary part of the application, was true and accurate up until the time the policy was delivered and the first premium paid.

Plaintiffs' third argument, which also fails, is that Pacific Life cannot show that Hammond made a misrepresentation with regard to her health at the time the application was completed on May 30, 1997. It is irrelevant to the operation of the condition precedent whether plaintiffs, by signing Part I on May 30, 1997, or Hammond, by being present and remaining silent about her health, may be deemed to have made a representation that the insured's health was in fact unchanged as of that date. Regardless of any representations made on May 30, 1997, the dispositive question is whether the condition precedent that the parties agreed would control the policy's effectiveness—that the application accurately reflected Hammond's health at the time of delivery and the payment of the first premium—was satisfied. Accordingly, it is irrelevant to the issue at bar whether plaintiffs or Hammond made any representation to Pacific Life on May 30, 1997.

Plaintiffs' final argument is that Pacific Life waived the condition precedent by its own actions. In Virginia, "[w]aiver is the intentional relinquishment of a known right, with both knowledge of its existence and an intention to relinquish

---

9. *See St. Paul Ins. v. Nusbaum & Co.*, 227 Va. 407, 316 S.E.2d 734, 736 (1984); *American* *Reliance Ins. Co. v. Mitchell*, 238 Va. 543, 385 S.E.2d 583, 585 (1989).

it."[10]  A waiver may be express or implied, but "[a] waiver of legal rights will not be implied except upon clear and unmistakable proof of an intention to waive such rights." *Creteau*, 119 S.E.2d at 339. In the insurance context, therefore, a waiver occurs "where the [insurer] expressly or impliedly leads the insured to believe it has given up a right under its policy." *American Hardware Mut.Ins. Co. v. BIM, Inc.*, 885 F.2d 132, 138–39 (4th Cir.1989). Yet, "[t]here can be no waiver, unless the person against whom it is claimed had full knowledge of his rights and of facts which will enable him to take effectual action for their enforcement," for "[n]o one can acquiesce in a wrong while ignorant that it has been committed and that the effect of his action will be to confirm it."[11]

These principles, applied here, confirm that no waiver occurred.  There is no doubt that Pacific Life did not possess the requisite information to make a knowing waiver.  On May 30, 1997, Hammond and plaintiffs knew that Hammond had responded to a medical questionnaire and submitted to a medical examination in January, and that Hammond had since undergone additional consultations and diagnostic tests.  Yet, neither plaintiffs nor Hammond revealed to Agent Mullen or Pacific Life that Hammond had undergone consultations and diagnostic tests that indicated a significant change in health from the time of the January medical examination.[12]  Moreover, nothing in the summary judgment record suggests that Pacific Life was on notice that Hammond's health had materially changed for the worse.[13]

10. *Creteau v. Phoenix Assur. Co. of N.Y.*, 202 Va. 641, 119 S.E.2d 336, 339 (1961); *see also Coleman v. Nationwide Life Ins. Co.*, 211 Va. 579, 179 S.E.2d 466, 469 (1971) ("A waiver takes place when a known right is intentionally relinquished."); *Roenke v. Va. Farm Bureau Mut.Ins. Co.*, 209 Va. 128, 161 S.E.2d 704, 709 (1968).

11. *Provident Life & Accident Ins. Co. v. Hawley*, 123 F.2d 479, 482 (4th Cir.1941).  As the Fourth Circuit has noted:

> To a just application of this doctrine ... it is essential that the company sought to be estopped from denying the waiver claimed should be apprised of all the facts: of those which create the forfeiture, and of those which will necessarily influence its judgment in consenting to waive it.... To permit.... concealment, and yet to give to the action of the company the same effect as though no concealment were made, would tend to sanction a fraud on the part of the policy-holder, instead of protecting him against the commission of one by the company.

*Combs*, 120 F.2d at 438.

12. The record does not conclusively disclose whether or when Hammond and the plaintiffs were given the results of these consultations and diagnostic tests.

13. Contrary to plaintiffs' suggestion, the fact that Hammond was a frail, 73–year–old,½ pack per day smoker who recently had some

medical problems, including an abnormal pap smear, could not, as a matter of law, have put Pacific Life on notice that it should further investigate Hammond's health.  Although plaintiffs correctly note that a waiver may be found where the insurer, "although not in possession of full information, had knowledge of facts of such a character as to suggest to a prudent person the need for further investigation into the insurability of the applicant," *Provident Life & Accident Ins. Co. v. Hawley*, 123 F.2d 479, 482 (4th Cir.1941), it is well-settled that "the critical factor upon which [such] a duty of further inquiry must be based is not simply the means to inquire, but the existence of a reason for doing so," *Rutherford v. John Hancock Mut. Life Ins. Co.*, 562 F.2d 290, 293–94 (4th Cir.1977).  Here the facts that plaintiffs identify as giving Pacific Life a reason to inquire further into Hammond's health were the very facts that the company in fact investigated in January 1997.  Put differently, these were the very risks that Pacific Life decided it was willing to insure, provided these risks remained unchanged as of the date of payment of the premium and delivery of the policy.  In sum, the facts plaintiffs recite imposed no duty on Pacific Life to further investigate Hammond's health because (i) it had already investigated these facts and found Hammond insurable; (ii) the policy provided that coverage was to take effect provided those facts did not change before the payment and delivery date; and (iii) neither Hammond nor plaintiffs disclosed

There is no evidence on which a reasonable jury could conclude that Pacific Life expressly or impliedly led Hammond or plaintiffs to believe that it had waived the condition precedent. Accordingly, plaintiffs' waiver argument fails.

■ Plaintiffs also argue that Pacific Life waived the condition precedent when it administratively closed the application file on or about April 1, 1997, expecting to reopen the file when the trust documents were completed.[14] This argument is meritless because there is no dispute that neither Hammond nor plaintiffs knew of, let alone relied on, Pacific Life's internal procedures and guidelines with respect to Certificates of Health, premium acceptance, or medical underwriting. There is simply no evidence to support the argument that Pacific Life waived the condition precedent.

In sum, it is clear that the policy included a valid condition precedent to its effectiveness, and that Pacific Life did not waive this condition precedent. And, it is equally clear that the condition precedent was not satisfied if Pacific Life is allowed to assert a defense to the plaintiffs' policy claim by relying on the information Hammond provided in Part 2.[15] Based on that information, it is apparent that changes in Hammond's health occurred between the time the Part 2 form was completed in January and the time the policy was delivered and the first premium paid. But if, as plaintiffs argue, Pacific Life is precluded from relying on Part 2 because it was not attached to the policy when issued or delivered, as required by Virginia Code § 38.2–3304(B)(2), a different result would obtain. Without Part 2 as part of the insurance contract, there would be no false statements in the application at any time because it is undisputed that all answers in Part I were correct. Neither would there be any "change in health of the proposed insured" because Pacific Life would have no admissible baseline against which to measure that health. It is pivotal, therefore, to determine whether § 38.2–3304(B)(2) bars Pacific Life's reliance on Hammond's answers in Part 2 as a defense to plaintiffs' claim.

### B.

Virginia Code § 38.2–3304(B)(2) provides that "[n]o statement shall be used in defense of a claim under the policy unless it is contained in a written application that is endorsed upon or attached to the policy when issued or delivered." Va.Code § 38.2–3304(B)(2); *Cf. Evans v. United Life & Accident Ins. Co.*, 871 F.2d 466, 471 (4th Cir.1989) (interpreting Va.Code § 38.1–393, a clause "similar" to Va.Code § 38.2–3304(B)(2)). Thus, for an insurer to avoid coverage as to a claim under a policy on the basis of a statement made by the insured or the applicant, the statement itself must be "endorsed upon or attached to the policy when issued or delivered."[16]

---

any *additional* facts regarding Hammond's health prior to payment and delivery.

**14.** *See supra* note 7 and accompanying text.

**15.** *See supra* note 6, discussing *Combs, Gustafson,* and *Webb,* all of which concluded that an undisclosed change in the proposed insured's health violated the condition precedent and voided the insurance policy.

**16.** Va.Code. § 38.2–3304(B)(2); *cf. Evans* 871 F.2d at 471 (holding that the purpose of

Va.Code § 38.1–393, a clause "similar" to Va.Code § 38.2–3304(B)(2), is to "require insurers to attach, as of the date they decide to issue insurance, the statements on which their decision relied"). The statute interpreted by the court in *Evans* differed from the current statute in that it did not contain the words "or delivered." The court made clear that issuance and delivery were separate events. Under a similar construction of the statutory language, the current statute would allow the statement relied upon in defense of a claim to

■ Here, it is clear that Pacific Life's defenses—namely, (i) that the condition precedent to the Hammond policy taking effect was not met, and (ii) that plaintiffs breached their duty of fair dealing—necessarily "use" Hammond's statements in the Part 2 medical forms. These statements are necessary for Pacific Life to establish that there was a change in Hammond's health that prevented fulfillment of the condition precedent and imposed an affirmative duty on plaintiffs to disclose new information regarding Hammond's health. Without Hammond's statements in Part 2, Pacific Life would have no datum from which to measure a change. Moreover, Virginia Code § 38.2–3304(B)(2) would prevent Pacific Life from offering extrinsic evidence of Hammond's condition in January and then again in May, because this extrinsic evidence was plainly not "endorsed upon or attached to" the policy when it was delivered. Here the only document allegedly attached to the policy was the Part 2 form. In sum, the viability of Pacific Life's defenses based on changes in Hammond's health rests on the question of whether the Part 2 form was "endorsed upon or attached to the policy when issued or delivered," as required by the statute.[17]

Yet, there is clearly a dispute of fact as to whether the Part 2 form was attached to the policy delivered to Hammond and plaintiffs. On one hand, there is evidence in the record that could support a jury finding that the form was not attached to the policy. For example, Pacific Life's delivery requirements sheet, which lists the various forms required for delivery, does not, as plaintiffs note, indicate that Form Number AP8601–1, the Part 2 form, is a delivery requirement. Moreover, the insurance agent, Mullen, responding to interrogatories, stated that he "did not know the results of medical examinations ... until he received a copy of the Motion for Judgment which had Part 2 of the application as an exhibit to it." Finally, Pacific Life's own file for the issued policy [18] does not include a Part 2 form. On the other hand, Judy Brown, Vice–President for Client Services of Pacific Life, testified that copies of the Part I and Part 2 forms that were shown to her at her deposition were in fact duplicates of the policy that would have been delivered to Hammond and plaintiffs on June 11. Moreover, Brown testified that policy documents are reviewed twice for completeness and accuracy before leaving the Home Office, and that the Hammond policy would not have been sent out without a copy of Part 2 attached. Karen Pontilo, the Pacific Life employee who, according to company records, assembled the disputed policy, testified in an affidavit that it was her practice to attach the Part 2 form to policies being assembled and that she has never had a policy returned to her for being incomplete. Pacific Life also points out that Agent Mullen testified that he had never seen a life insurance policy that did not

be attached to the policy either when issued or when delivered. *See Anderson v. Primerica Life Ins. Co.*, 934 F.Supp. 188 (W.D.Va.1996).

**17.** Pacific Life's argument that § 38.2–3304(B)(2) applies only to the defense of material misrepresentation, and not also to its condition precedent or duty of fair dealing defenses, is rendered ineffectual by the fact that the statute does not distinguish among defenses and instead applies by its terms to a "defense of a claim under the policy."

Moreover, because the statute is "remedial in nature" and "is couched in imperative and vigorous language[,] .... [i]t should not be frittered away by nice distinctions but should be construed so as to accord substance to its terms and make effective its purpose." *Southland Life Ins. Co. v. Donati*, 201 Va. 855, 114 S.E.2d 595, 599 (1960).

**18.** The issued policy was assigned no. 1A23245420. *See supra* note 7.

contain a completed Part I and Part 2, and that, while he does not specifically recall seeing the Part 2 form, he "flipped through" the Hammond policy before delivery "to see if all the pieces were there" and recalls no discrepancies. Pacific Life additionally notes that plaintiffs admitted in their deposition that they did not examine the policy upon delivery and that Daphne Hammond only "flipped through it very summarily," and did not read any part of it at a later time.

In sum, both parties have presented only conflicting circumstantial evidence as to whether the Part 2 form was attached to the Hammond policy upon issuance or delivery. This dispute of fact is plainly material and hence precludes summary judgment.

Accordingly, for these reasons, the parties' cross-motions for summary judgment must be denied.

An appropriate Order will issue.